**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America,       ) | No. CR-10-8026-PCT-GMS |
|                          ) |  |
|          Plaintiff,          ) | **ORDER** |
|                          ) |  |
| vs.                       ) |  |
|                          ) |  |
| Tymond J. Preston,          ) |  |
|                          ) |  |
|          Defendant.          ) |  |
|                          ) |  |

Pending before the Court is Defendant's Request For a Voluntariness Hearing And A Motion To Suppress Statements (Doc. 47). The Court previously granted the request for a voluntariness hearing that was held on January 13, 2011. After hearing the evidence presented at that hearing, the Court denies the Motion to Suppress for the reasons set forth below.

**BACKGROUND**

Defendant is charged in an Indictment with violating Title 18, United States Code Sections 1153, 2241(c) and 2246(2)(A) by molesting an eight year-old boy in his residence on an Indian Reservation on or about September 23, 2009. September 23, 2009 was a Wednesday. On that date, Defendant was eighteen years old. During the early evening of October 1, 2009, eight days after the alleged crime occurred, Special Agent James Kraus of the Federal Bureau of Investigation and Criminal Investigator Greg Secatero of the Tuba City Criminal Investigations Division met at Defendant's home on the reservation at about 5:00

1 p.m. to interview him. Special Agent Kraus was dressed in a shirt and jacket with khaki 2 pants. He was wearing a revolver but it was concealed by his jacket. He was driving an 3 unmarked car. Similarly, Criminal Investigator Secatero was in plain clothes. His vehicle 4 was also not marked, and he was not armed. Neither of the agents had extensively studied 5 Defendant's background prior to interviewing him.

6 The law enforcement agents found Defendant out in front of his residence with two 7 other people. Special Agent Kraus showed the Defendant his identification. The agents 8 explained to Defendant that they wanted to talk with him, he was not under arrest, that he 9 was free to terminate the interview at any time, and that he would not be arrested on that 10 evening. The agents did not provide Defendant with *Miranda* warnings.

11 Defendant agreed to talk with the officers and the balance of their interview was tape 12 recorded and was played at the hearing. The interview occurred in the front of Defendant's 13 residence. At one time, during a part of the investigation, that dealt with whether Defendant 14 had committed sexual acts, Criminal Investigator Secatero asked Defendant if he wanted the 15 interview to be completed in one of the vehicles, presumably out of the presence of the other 16 two persons present, but Defendant declined.

17 During the interview, which lasted for about forty minutes, the officers did the great 18 majority of the talking. They began the interview by indicating that they had heard about 19 something going on with Defendant's cousin. Defendant asked if "they" were trying to 20 blame him for "that shit." When asked what he meant, Defendant denied that he did 21 anything. When the agents followed up by asking Defendant what happened with respect 22 to what "they" were talking about, Defendant said he didn't know what "they" were talking 23 about, but "they were doing stuff" towards him and accused him of doing stuff towards their 24 kid. He then described it as motivated by family hate. When asked what "they" were trying 25 to blame him for, Defendant indicated he did not know.

26 The agents indicated to Defendant that they were inquiring about a charge of 27 molestation, and that forensic testing eventually would demonstrate that something happened 28 and would further help establish the facts of exactly what happened, and they wanted to

- 2 -

1  obtain his version of events.

2        Although the crime was alleged to have occurred on September 23, which was a
3  Wednesday, the agents stated in the interview both that the alleged incident occurred on the
4  23rd, and that it occurred on "Friday". However, as has been noted, September 23rd was a
5  Wednesday, not a Friday. Defendant denied having been at his residence on the previous
6  Friday. But the agents persisted that they had witnesses that placed the victim at Defendant's
7  residence. The agents alternately and sometimes interchangeably referred to that occasion
8  as either or both September 23rd and Friday. Defendant persistently denied being at home
9  on Friday, and he denied doing what his cousin said that he did, whatever that was.
10 Defendant further indicated that his apparent accusers "do witchcraft towards us" that
11 resulted in the paralyzation of his father, and him losing control towards his family on
12 occasion and further feeling weak.

13       The agents stated that they didn't buy Defendant's story and wanted to know what
14 happened and didn't want to have to return repeatedly to interview Defendant. They further
15 stated that they would turn the results of their investigation over to the United States'
16 Attorney and that office would decide whether to do something with respect to the
17 investigation and that it just wouldn't be good for anyone if Defendant didn't tell them the
18 truth in the interview. Defendant continued to deny that anything happened despite what his
19 accusers thought that he did to his cousin.

20       In response to a question about what happened on that day Defendant indicated that
21 he had a poor short-term memory apparently because of a tumor for which he had received
22 past hospital treatment that had ceased. But Defendant asserted that he remained disabled
23 and as such was not allowed to attend school because of the way he acts.

24       In their questioning of Defendant, the agents further emphasized their desire to
25 distinguish whether the accusations against him might have been a one-time act or whether
26 he was a serial child predator. They indicated that help might be available for one-time
27 offenders, but only if such offenders were truthful about their problems. They also
28 represented to Defendant that whatever he shared with them would be imparted to the U.S.

- 3 -

1  Attorney's office, but would go no further. The agents admittedly created the impression that
2  if Defendant was guilty of the crime, admitting the guilt could minimize the consequences.
3  During the course of the interview, the agents asked Defendant suggestive questions
4  such as whether it was a one-time event, whether the victim pulled down his own pants,
5  whether Defendant unzipped his own pants or pulled them down, whether Defendant put on
6  a condom, whether and for how long he penetrated the victim, whether he threw the condom
7  away, etc. In response to these questions, Defendant made some admissions. At the end of
8  the interview the officers wrote out a document which they represented to Defendant could
9  contain his apology to the victim. In the document, the officers summarized the confessions
10 that they had obtained from Defendant, included an apology to the alleged victim, and had
11 Defendant review and sign the document, which he did.
12 At hearing, Defendant called Dr. John DiBacco as an expert witness. Dr. DiBacco
13 offered evidence that the interview technique used by the agents was inappropriate and
14 persistent; and that Defendant may be susceptible to the inappropriate questions and promises
15 made by agents because he is substantially below average in his communication and
16 comprehension skills. Dr. DiBacco further testified that Defendant has been in special
17 education courses as a result of these poor verbal communications skills. Under such
18 circumstances Defendant's expert opined, Defendant might have been willing to say what
19 he perceived his questioners wanted him to say to bring the interview to an end.
20 Defendant argues that the transcript provides evidence that the agents demonstrably
21 overcame his independent will because he admitted to events that occurred on Friday,
22 September 23, when, in reality September 23 was a Wednesday afternoon, and Defendant
23 was not on the reservation on Friday.

**ANALYSIS**

25 The prosecution has the burden of demonstrating that a confession is voluntary.
26 *Brown v. Illinois,* 422 U.S. 590, 604 (1974). The applicable standard in determining whether
27 to suppress a statement made by a defendant as involuntary is whether, under a totality of the
28 circumstances surrounding the confession, a defendant's will was overborne. *Dickerson v.*

- 4 -

1 *United States,* 530 U.S. 428, 434 (2000*) "*The due process test takes into consideration 'the 2 totality of all the surrounding circumstances–both the characteristics of the accused and the 3 details of the interrogation.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). *See* 4 *also Haynes v. Washington,* 373 U.S. 503, 561-2 (1962)*, Gallegos v. Colorado,* 370 U.S. 49, 5 55 (1962)*; Reck v. Pate,* 367 U.S. 433, 440 (1961) "The determination 'depends upon a 6 weighing of the circumstances of pressure against the power of resistance of the person 7 confessing.'" *Dickerson* at 434 quoting *Stein v. New York,* 346 U.S. 156, 185 1953). "The 8 test is whether, considering the totality of the circumstances, the government obtained the 9 statement by physical or psychological coercion or by improper inducement so that the 10 suspect's will was overborne." *Haynes v. Washington,* 373 U.S. 503, 513-14, (1963).

11 **I.     Details of the Interrogation**

12     In the instant case, the agents testified that they told Defendant that they just wanted 13 to talk to him, that he could end the interview whenever he wished and that he was not under 14 arrest, nor would he be arrested on that evening.  Further, the interview did not occur in a 15 coercive setting – it took place in the front of Defendant's home on the reservation in front 16 of his brother and another person.  Nor did the interview take a considerable time, lasting in 17 total about forty minutes.  The agents did not overtly display authority, force or the threat of 18 force to obtain Defendant's unwilling cooperation.  The agents were not in uniform, did not 19 drive marked cars, nor were their weapons on display.

20     **A.     Mode of Interrogation**

21     After Defendant denied that he did anything to his cousin, and further did not engage 22 in any sort of narrative with the agents concerning the accusations, the agents asked 23 Defendant focused questions that contained some details about the allegations made.  They 24 asked such questions in the context of admonishing Defendant to tell them the truth, 25 suggesting to him that it would be to his advantage to do so, and in an attempt, whether 26 strategic or real, to engage Defendant in helping them determine whether any act of 27 molestation he may have committed was a one-time event, or whether Defendant was a serial 28 child abuser.

1    On cross-examination Dr. DiBacco testified that, as a standard matter, the interview
2 protocol the agents should have used was the same interview protocol used to ensure that
3 investigators obtain the most reliable information from alleged juvenile victims of sexual
4 assaults.  Such techniques encourage attempting to engage the child victim in a narrative in
5 which he or she voluntarily provides the details of the alleged assault.  Such techniques
6 further discourage initially asking suggestive or focused questions to the victim, which might
7 have the tendency to suggest to the victim otherwise unavailable details of an alleged
8 assault, and, thus, compromise the credibility of the testimony.

9    Dr. DiBacco testified that the same interview techniques used to ensure the maximum
10 accuracy of the account of a potential child victim of sexual assault should be used in
11 interviewing adults who are potential suspects for such assaults because both types of
12 interview subjects might have reasons to conceal the information sought.  There are,
13 however, some important distinctions between interviewing a victim and a suspect of a
14 possible instance of child abuse.

15    It is clear to the Court that, when interviewing a child victim of sexual assault, an
16 interviewer should avoid, if possible, asking questions that contain details of the assault that
17 might be consciously or unconsciously adopted by a child victim in his or her response.
18 Children are likely to be more impressionable to such suggestions and assume them as true
19 to please their interrogators without necessarily understanding how adopting such details in
20 their responses might unfairly implicate others.

21    Nevertheless, adults who may be suspects are, presumably, not as susceptible to
22 suggestion as are children, and are not as likely to try to please their interrogators in
23 voluntary interviews.  Further, unlike child victims, adults who may be suspects in criminal
24 investigations have no motivation, and in fact a serious disincentive, to adopt details of a
25 crime suggested by a law enforcement agent's question when doing so would incriminate
26 them for serious criminal conduct.  This is especially the case when they have some basis to
27 believe that they are the subject of the investigation.  The mere fact that agents asked officer
28 questions that might include details concerning the alleged assault, does not mean that a

1  defendant's will was overborne by such questions.

2  It is clear from the Court's review of the interview with Defendant that Defendant was
3  aware of the serious nature of the charges about which he was being questioned. During the
4  interview Defendant expressed resentment against those who he said were falsely accusing
5  him of such conduct and he initially denied it. He further apparently fabricated a non-
6  existent brain tumor for which he claimed to have received hospital treatment to explain his
7  short-term memory loss and his inability to remember the answers to some questions. The
8  content of the interview also demonstrates that Defendant had the capacity to deny the
9  allegations. The interview was not so lengthy as to override Defendant's will in that respect.

10 Further, as Dr. DiBacco acknowledged on cross-examination, those suspected of
11 crime will most often decline to engage in narratives with their interrogators just as
12 Defendant did not engage in a narrative description in this case. Dr. DiBacco acknowledged
13 that even his preferred interview technique would permit the use of more suggestive
14 questions if and when a child interview subject declined to engage in a narrative description
15 of events when provided with adequate opportunities to do so. Thus, when Defendant did
16 not engage in a narrative with the agents, even Dr. DiBacco's preferred interview method
17 would permit more focused questions. While Dr. DiBacco identified suggestive questions
18 that were used in the interview of Defendant, he identified none that were "leading."

19 **B.    Promises and Representations.**

20 Defendant argues that the agents misrepresented facts to Defendant, told him they
21 didn't believe his version of events and made him promises of favorable treatment if he
22 confessed. This Defendant, argues, coerced him into confessing.

23 Nevertheless, agents may advise a suspect that they do not believe him in order to
24 elicit further information. *United States v. Wolf,* 813 F.2d 970, 975 (9th Cir. 1987). In this
25 case, Agent Secatero told Defendant that he "wasn't buying it" when Defendant told the
26 agents that his accusers had been using witchcraft against him and his family causing him to
27 lose control with his family and feel weak. Further, the agents suggested to Defendant that
28 they did not believe his denial that the victim had been over at his house when in fact they

had other witnesses who suggested that he had. And, after Defendant admitted that the victim came into his house but asserted nothing happened, the agents indicated that their previous investigation suggested that something in fact did happen. Under such circumstances, the law enforcement agents' expressions of disbelief do not amount to coercion.

An agent's "repeated exhortations to tell the truth do not amount to coercion." *Amaya-Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir. 1997). As well, agents may also inform a suspect that his cooperation may have a positive effect on his ultimate sentence, without that information constituting coercion. *Williams v. Woodford,* 384 F.3d 567, 594 (9th Cir. 2004). In this case, the agents indicated to Defendant that the United States Attorney would decide whether to bring the case and that if he was dishonest it would not be to his benefit. They further told Defendant that if he molested the victim in just a one-time incident that there might be help for him if he admitted to it. Such general pronouncements do not make any definable promises. And, while they do suggest that there may be benefits to telling the truth, as *Williams* establishes, they do not amount to coercion or an "improper inducement" in the absence of threats or other coercive practices.

**II.    Defendant's Personal Circumstances**

Dr. DiBacco testified that Defendant had persistent problems with verbal communication and comprehension and had spent time in special education classes as a result. He declined to precisely quantify the extent of Defendant's disability in verbal communication and comprehension, and further declined to give any rough approximation of Defendant's "psycho-emotional" age as opposed to his chronological age. But, Dr. DiBacco did opine that Defendant was "significantly below average" in communication and comprehension skills.

However, other than suggesting that Defendant might have been confused or given the agents the answers they wanted to hasten the end of the interview, Dr. DiBacco offered no explanation of how an inability to comprehend the questions or communicate answers would have contributed to the loss of Defendant's exercise of will, in this relatively brief and

1 otherwise uncoercive interview. Nor was there any convincing explanation of how a
2 difficulty in understanding the agents factually-suggestive questions would have resulted in
3 Defendant's will being overborne to the extent that he would adopt those factual suggestions.

4 To evaluate Dr. DiBacco's argument, however, the Court both listened to and
5 reviewed a number of times the transcript of the interview. Throughout Defendant's
6 interview, Defendant's responses and verbal demeanor demonstrate that he understood the
7 questions, and that he voluntarily made the statements that are the subject of the motion to
8 preclude. The interview was not overly long. The expressions of disbelief by the agents
9 were not coercive; and neither were their exhortations encouraging Defendant to tell the
10 truth. The transcript further demonstrates that Defendant remained capable of declining the
11 agents' suggestions (*e.g.* that he be interviewed in one of their cars), and remained capable
12 of denying the agents' allegations and suggestions. This interview occurred in front of two
13 other people.

14 Defendant claims that the fact that he confessed to committing criminal acts on Friday
15 demonstrates that his will was overborne because he was not at home on the previous Friday
16 evening. He thus argues that his will must have been overborne if he confessed to
17 committing criminal acts on a date that he could not have committed them. Nevertheless,
18 after reviewing and re-reviewing the recording and the transcript of the interview it appears
19 to the Court that Defendant never retracted his repeated denials that he was at home on
20 "Friday." His admission to particular acts was not necessarily tied to the Friday preceding
21 his interview with the agents. There may have been some confusion in the interview that
22 resulted from the agents' incorrect assumption that September 23 was Friday, and the
23 occasional reference to Friday separately, and in conjunction with the 23rd, during the
24 interview as being the date of the crime. But, during the interview the agents also referred
25 to September 23 as the date of the alleged acts, and further realized at the end of the
26 interview that the 23rd was not Friday. The mistaken day of the week used by the agents in
27 the interview does not provide sufficient evidence on which this Court is persuaded that the
28 agents questioning overrode the free will of Defendant.

Having assessed the nature of the interrogation at issue, and the extent of Defendant to resist the pressure brought upon him by the agents, the Court is of the opinion that the government has met its burden that the statements were not the result of Defendant's will being overborne.

**IT IS THEREFORE ORDERED** denying the Motion to Suppress (Doc. 47).

DATED this 20th day of January, 2011.

_____
G. Murray Snow
United States District Judge

- 10 -