**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America,           ) | No. CR 10-8026-PCT-GMS |
|                                      ) |  |
|     Plaintiff,   ) | **AMENDED VERDICT AND FINDINGS** |
|                                      ) | **OF FACT PURSUANT TO FEDERAL** |
| vs.                                  ) | **RULE OF CRIMINAL PROCEDURE 23(c)** |
|                                      ) |  |
| Tymond J. Preston,                   ) |  |
|                                      ) |  |
|     Defendant.   ) |  |
|                                      ) |  |

Defendant has been charged by information (Doc. 104) with Abusive Sexual Contact in violation of Title 18 U.S.C. §§ 1153 and 2244. The government has the burden of establishing beyond a reasonable doubt the following four elements: (1) Defendant, an Indian, § 1153(a), (2) knowingly engaged in abusive sexual contact, § 2244, (3) with "an individual who has not attained the age of 12 years," § 2244(c), (4) within Indian country, § 1153(a). Defendant waived his right to trial by jury, and this matter was tried to the Court on May 24 through May 26, 2011. This constitutes the Court's written findings of fact pursuant to Federal Rule of Criminal Procedure 23(c).

**THE COURT FINDS THAT:**

1. The most significant element of the crime charged, and the one that is contested by Defendant is the allegation that on or about September 23, 2009, Defendant knowingly engaged in sexual contact with the victim's buttocks or anus with Defendant's penis, and Defendant had an intent to abuse, humiliate, harass, degrade or arouse the victim or gratify

1 Defendant's sexual desire.

2     2.    As with the other elements of the crime to be discussed below, the government
3 has the burden of proving the element beyond a reasonable doubt.

4     3.    To meet that burden with respect to this first element the government puts forth
5 several items of evidence. Most significantly, the government puts forth the confession of
6 Defendant.

7     4.    On October 1, 2009, Defendant admitted to investigating officers, both orally
8 and in a written statement, that on the evening of September 23, 2009, he was in the house
9 by himself. (Ex. 4 at 18). The victim came inside the house, (*id.* at 19), and pulled his own
10 pants down (Ex. 4 at 24, 28) in the living room of Defendant's home (*id.* at 24, 29).
11 Defendant put a condom on, (*id.* at 20–21), and Defendant put his penis in the victim's butt
12 for a short time. Defendant estimated that he did so for about five or six seconds. (Ex. 4 at
13 21–22, 28–29). Defendant stated that he only put a little bit of his penis into the victim (Ex.
14 4 at 23, 28), then he pulled away. (Ex. 4 at 28, 30). Defendant did not ejaculate, or "no white
15 stuff" came out of Defendant's penis, not even in the condom (Ex. 4 at 22, 28). Defendant
16 threw the condom away. (Ex. 4 at 28). Defendant stated that after he pulled out, the victim
17 started laughing. The victim told Defendant he was going to tell on him and then started
18 crying and made a "big old deal." (Ex. 4 at 22, 27, 28–30). Defendant did not have the urge
19 to engage in the sex act with the victim, but the victim came onto him. Defendant stated that
20 he, meaning Defendant, wasn't "all there." (*Id.* at 26). But, for a second he decided to just
21 do it. (*Id.*). The victim told investigating officers that Defendant was not drunk or on drugs
22 (*id.* at 12, 17, 25), and the occurrence was only a one time thing (*id.* at 14, 18).

23     5.    Prior to trial Defendant moved to suppress the confession as being involuntary.
24 (Doc. 47). During that hearing, and the associated briefing, *see, e.g.*, Docs. 47, 54, 69,
25 Defendant argued that his will was overborn, and that the confession was not voluntary. The
26 Court, after hearing the evidence and argument offered at the suppression hearing, ruled that
27 the confession was not coercive, and that Defendant's will was not overborn in giving it.
28 (Doc. 74). The Court re-adopts those findings and that determination.

6. Defendant suggests that there is additional evidence on which this Court should find that Defendant's will was overborn. Defendant argues that by asking Defendant whether he used a condom, the investigator was planting with Defendant the idea that he had used a condom. The Defense further argues that Defendant, who was unusually susceptible to questioning, adopted this factual suggestion when it was in fact not true. This is, however, not new evidence, it is only argument, and it was previously made with respect to the motion to suppress.

7. Defendant does offer into evidence at trial the competency evaluation of Defendant conducted by Daniel C. Cady, Ed.D. Dr. Cady's report was summarized in the evidentiary hearing on the motion to suppress but was not moved into evidence. Dr. Cady's report determines, as was earlier discussed at the suppression hearing, that while Defendant has normal cognitive processing skills, he has significant deficits in general linguistic and academic skills. The Court is mindful of Defendant's relative youth, and his deficits in general linguistic and academic skills and low IQ and took those factors into account in determining whether Defendant's confession was voluntary.

8. In addition to the reasons that it then made finding that the confession was voluntary, the Court notes that on cross-examination, Defendant's mother testified that Defendant was trusted by his parents to take care of himself for the most part. Defendant's father, throughout this period, worked out of state, and his mother worked every day from eight to five and spent significant time at the residence of her own mother at Cow Springs, and at the residence of another son. She also visited her husband on the weekends at his work location while leaving Defendant at home alone.

9. Further Defendant's most significant friend was his cousin Wayman who was apparently close to his own age. In addition to being age appropriate Wayman believed that Defendant understood what Wayman said during conversations although he thought that sometimes Defendant was "a little slow getting stuff."

10. Further, Defendant was trusted by his family to babysit his nieces and nephews, to assist in taking care of the family sheep, and to assist his brothers in their hobby of doing

body work on monster trucks.

11. His mother testified that she discussed with Defendant the criminal charges brought against him on ten occasions. He consistently denied the charges. Defendant's mother testified that he understood the nature of the charges and her questions during their discussions on the topic. Defendant and his mother had engaged in other discussions regarding the use of safe sex practices, which Defendant understood.

12. In short, the trial revealed additional facts which make the Court conclude that Defendant had sufficient cognitive abilities so that his will was not overborn by the relatively brief and uncoercive interview he had with law enforcement officers in front of his own home with others present which resulted in the confession.

13. To be sure, a confession can be highly probative evidence. Nevertheless, confessions can be false, coerced or erroneous in whole or in part. A confession alone may not in many circumstances constitute proof beyond a reasonable doubt that a crime has been committed. In this case, however, there is significant probative physical evidence and other corroboration of Defendant's confession.

14. A swab taken from the underwear that the victim was wearing on the day of the assault resulted in a sample of DNA that was contributed to by probably three, and possibly more, people. Although the actual number of the possible donors to the sample could not be definitively determined, the variety of the alleles at the various loci tested was limited, suggesting that the number of persons contributing to the sample was, itself, limited. The various alleles of the donors to the DNA sample were determined in thirteen locations. An additional location was sampled to indicate the gender(s) of the contributors. The alleles in the sample were compared to the DNA of Defendant, the victim, and the eight other persons living in the victim's home, some or all of whom had some blood relation to Defendant.

15. As a result of that testing neither the victim nor Defendant were excluded as possible donors to the DNA sample. Of the eight remaining people who were tested, six were eliminated as possible donors. The remaining two of the eight family members tested,

1 Carolyn Begay the victim's grandmother and Brian Black the victim's young cousin, would
2 also have been eliminated as possible donors to the DNA sample, but for the appearance of
3 two "stutter peaks". Although the "stutter peak" is more likely explained by the anomaly that
4 results from the process used to reproduce the allele patterns contained in a DNA sample,
5 it is possible that the "stutter peak" could reflect the actual presence of a very small amount
6 of the allele at the loci in question. As a result, while Carolyn Begay and Brian Black may
7 not be likely contributors to the DNA sample, neither could be ruled out as possible
8 contributors.

9     16. Nevertheless, even assuming that the victim, Carolyn Begay and Brian Black
10 were all contributors to the DNA sample, there are still unexplained alleles at five of the
11 thirteen loci in the DNA sample. The DNA of Defendant provides each of those five
12 unexplained alleles. Given the presence of the five alleles, 99.8% of the general Navajo
13 population can be excluded as possible contributors of such DNA.

14     17. While statistical adjustments have been made to reflect the close genetic
15 relationships among the Navajo population, this exclusion percentage of 99.8% would be
16 reduced if the pool considered were limited to close family members who shared blood
17 relation. Nevertheless, all of Defendant's relatives living in the victim's home other than
18 Begay and Black were excluded as contributors to the DNA, and Begay and Black could not
19 have contributed the alleles at five of thirteen loci that are unexplained.

20     18. The Court further finds that those alleles were not provided by Defendant's
21 siblings or his father. Defendant's siblings or father may or may not have had the qualifying
22 alleles, but in any event they were not living at Defendant's residence at the time of the
23 incident. Defendant's mother testified that she did not have physical contact with the victim
24 at the time that the alleged molestation occurred. No other evidence identified persons who
25 might have been related by blood to Defendant who resided in the vicinity or had contact
26 with the victim.

27     19. The DNA evidence does not identify Defendant as the only person who
28 theoretically could have been the donor of the five otherwise unexplained alleles in the DNA

1  sample. Nevertheless, the existing evidence demonstrates that it is very improbable that the
2  source of the unidentified DNA is anyone other than Defendant. The evidence includes the
3  following: (1) Defendant admitted that he inserted his penis into the victim's anus on the
4  subject date; (2) Defendant's DNA is a match to the unaccounted for allele pattern in the
5  DNA sample taken from the victim's underwear the day after Defendant admitted assaulting
6  Defendant; (3) no other person living in the home of either the victim or Defendant could
7  apparently be the source of the unexplained alleles in the DNA pattern; and (4) statistically
8  only two-tenths of one percent of the general Navajo population could be a possible source
9  of DNA identical to Defendant. Such evidence strongly corroborates Defendant's
10  confession.

11  20.  Defendant's confession is also corroborated by some of the statements of the
12  victim. On September 23 and 24, 2009, the victim stated in both excited utterances to his
13  grandparents and in statements made to Susan Clinton, a medical professional consulted to
14  obtain a diagnosis, that Defendant inserted his penis into the victim's butt, and that, as a
15  result, the victim was in considerable pain.

16  21.  Defendant alleges that these statements made by the victim should be wholly
17  discredited because, particularly during the forensic interview conducted by Carli Moncher,
18  which preceded his medical examination, the victim apparently placed the assault in the
19  context of what appears to be an imagined narrative involving sexual assaults on the victim's
20  sister, Defendant's confrontation with the victim in the victim's bedroom, Defendant's
21  escape from the victim's bedroom, knife threats, Defendant's pursuit of the victim to the
22  victim's grandmother's house seven miles away, helicopters, searchlights and 911 calls.
23  Many of these details are obviously not factual.

24  22.  Further, in his forensic interview, the victim indicated both that this was the
25  first time that he had been assaulted by Defendant, and, to the contrary, that he had been
26  assaulted by Defendant on a daily basis. And, when the victim described the details
27  concerning the actual assault, the victim described events that are unsupported by the
28  subsequent forensic examination of the victim and his clothing. For example, the victim

1  indicated that during the course of the assault Defendant ejaculated in his mouth, on his lips, 2 on his red shirt, and on his stomach. The forensic examination of the victim and the clothing 3 he was wearing nevertheless revealed neither evidence of any semen nor the existence of any 4 red shirt. For that matter the physical examination of the victim showed no signs of trauma 5 or semen. The forensic analysis never checked for the presence of any saliva.

6     23. Carli Moncher is an experienced forensic interviewer of children. She 7 conducted the victim's forensic interview and testified about it. She further testified in the 8 abstract, based on her experience and the literature in the field with which she is familiar, 9 that in a forensic interview setting, children can construct narratives concerning their 10 victimization to remove themselves from the role of the victim and to minimize their 11 cooperation and exaggerate their resistance to the abuse. She further offered testimony that 12 may imply that the multiple particulars of abuse related by the victim reflect "script 13 memory," a phenomenon in which a victim of multiple sexual assaults conflates his or her 14 memory of repeated assaults into the last assault the victim suffered, whether such details 15 actually occurred in the specific assault or not.

16     24. The Court rejects any invitation by the government to assume that the victim's 17 statements describing the assault that are inconsistent with the forensic evidence in this case 18 result from previous assaults on the victim by Defendant, or anyone else. Not only did Ms. 19 Moncher never conclusively testify to the existence of such a diagnostic theory, but also it 20 is doubtful that she has the qualifications to do so. To the extent she nevertheless did so 21 testify, she was subjected to effective cross-examination concerning the suitability of 22 applying such a technique in a forensic setting. In short, in the absence of sufficient evidence 23 that Defendant or anyone else previously assaulted the victim, the Court will not assume that 24 Defendant did so in order to explain away details of the victim's statements that are 25 inconsistent with the forensic examination.

26     25. Nevertheless, the Court is of the opinion that Ms. Moncher has sufficient 27 experience as a forensic interviewer of young children to testify as to the tendency of a child 28 to avoid difficult topics and to deflect attention from acts for which he or she may feel guilt

1  or shame by constructing a story that is in many of its particulars inconsistent with the facts.
2  Although Ms. Moncher did not testify that this was the case with respect to the victim in this
3  case, the Court accepts the proposition that just because much of the victim's narrative of
4  abuse is imaginary, that does not mean that all of his testimony should be dismissed out of
5  hand. Nevertheless, the victim's inaccurate recitation of some events pertaining to his assault
6  requires that all of his statements be evaluated with caution. It further requires that all
7  assertions that are inconsistent with the forensic evidence or unsupported by other evidence
8  be rejected.

9       26. Nevertheless, the excited utterances made by victim both to his grandparents
10 and the medical personnel were that Defendant inserted his penis into the victim's butt.
11 Indeed, even in the forensic interview this is the statement most frequently and emphatically
12 made by victim. This statement is corroborated not only by Defendant's admission, but by
13 the presence of Defendant's same DNA profile in victim's underwear. And, as Ms. Clinton
14 explained, a normal examination, meaning one that reflects no trauma to the buttocks or
15 rectum, is neither consistent nor inconsistent with a sexual assault. Anal examinations are
16 frequently normal even after assault due to the use of lubrication, the size of the penis, and
17 the fact that the anus is stretchable at a young age.

18      27. Ms. Clinton testified that in her forensic examination of the victim, she asked
19 the victim whether Defendant used a condom. The victim told her that Defendant put on a
20 "dick wearing", then he "spits on his dick" and "he puts it in my butt." While Defendant
21 asserts that the use of a condom was suggested to the victim by Ms. Clinton's question,
22 Defendant admitted in his confession to using a condom and putting it on himself. This
23 admission by Defendant himself effectively refutes Defendant's argument.

24      28. Defendant asserts that there is reason in the transcript to believe that the victim
25 had seen and could describe ejaculate by watching pornographic movies, and that this was
26 his source of knowledge concerning ejaculate and it properties, rather than the result of abuse
27 by Defendant. The Court agrees that there is sufficient evidence in the record to conclude
28 that the victim had been exposed to pornographic movies at the home of Defendant or

1  otherwise.  In his confession, Defendant similarly maintains that he did not ejaculate after
2  inserting his penis into the victim.  In the absence of any semen or sperm located as a result
3  of the forensic examination, there is no sufficient evidence on which to conclude that
4  Defendant ejaculated in or on the victim.

5        29.    The Court further agrees that there is insufficient evidence that Defendant
6  previously had engaged in sexual contact with the victim.

7        30.    Nevertheless, the completion of the crime for which Defendant is charged by
8  does not require the government to prove either that Defendant ejaculated on the victim, or
9  that Defendant had previously engaged in sexual activity with the victim.

10        31.    In response to the government's evidence, the Defense offered the testimony
11  of Dr. Miller.  He testified that the alleles from the DNA sample from the victim's underwear
12  that could only be attributed to Defendant among the persons tested might nevertheless be
13  contributed by any number of people.  He further testified that the alleles in the DNA sample
14  that matched the alleles in Defendant's DNA might be the result of secondary transfer, or a
15  passive event to the victim's underwear.  He further testified that he saw what could be
16  interpreted as some degradation in the DNA evidence.

17        32.    On rebuttal the government's expert opined that the quantity of the sample
18  tested from the victim's underwear was inconsistent with a passive event or secondary
19  transfer, and that the DNA sample did not show signs of degradation, and that even if it did,
20  such a showing alone would not exculpate Defendant.

21        33.    Defendant further offered testimony through his mother.  His mother testified
22  that she took September 23 and 24 off from work due to the fact that she suffered from
23  stomach flu.  She testified that during the day she was mostly at home except for a period in
24  the afternoon when she went into work to deliver her leave slip.  When she returned home,
25  the victim was leaving the house angry and swearing at Defendant.  She said upon entering
26  the home that Defendant told her that the victim was playing with Defendant's X-box, and
27  that when the victim broke it, Defendant "kicked his butt."  She testified that she remained
28  home the rest of the day.  She testified that she did not come forward with this story to law

1   enforcement because she "did not want to get involved."

2       34. Scott Decker, the investigator for Defendant further testified, without objection
3   from the government, that in an interview he had with Wayman, Defendant's cousin,
4   Wayman indicated that he had spent most of the day with Defendant, with the exception of
5   about fifteen minutes in the afternoon. After returning to Wayman's house from his own that
6   afternoon, Defendant told Wayman that he had found the victim in his house and had chased
7   him out. Wayman, in a later interview with the FBI, denied that Defendant had ever made
8   such a statement to him on that day, although he did affirm that Defendant did have an X-box
9   that the victim played with that was subsequently broken.

10       35. Based on its evaluation of the above testimony, and its evaluation of the
11   credibility of the witnesses, the Court finds that the government has proven beyond a
12   reasonable doubt that Defendant knowingly engaged in sexual contact with the alleged victim
13   on September 23, 2009, in that he did so with the intent to abuse, humiliate, harass, degrade
14   or arouse the victim or gratify Defendant's sexual desire.

15       36. The combination of Defendant's confession, together with the corroborating
16   DNA evidence, and the at least minimally probative evidence of the victim's utterances that
17   Defendant put his dick in the victim's butt is sufficient to prove this element of the crime
18   beyond a reasonable doubt.

19       37. Defendant's version of events does not raise a reasonable doubt as to the
20   existence of this element. First, while Defendant's assertion that he "kicked the victim in the
21   butt" might have independently explained the victim's pain, it does not explain Defendant's
22   failure to raise this matter to the investigators when they came eight days later to get
23   Defendant's version of events. The Court does not find counsel's argument that Defendant
24   neglected to offer this explanation because he was confused about the day on which the
25   incident occurred sufficient to raise a reasonable doubt.

26       38. Second, the Court finds that the quantity of the DNA sample is inconsistent
27   with passive transfer, and that the presence of DNA consistent with Defendant is not
28   explained by Defendant kicking the victim in the butt, or otherwise chasing the victim out

1  of his house.

2  39. Third, the Court finds Defendant's mother's testimony less than credible on
3  several different counts. First, mother's testimony that she was home all day except for when
4  she went to work to deliver her leave slip rings hollow when, no one was at the home, or at
5  least no one answered the door on the two different occasions that Officer Butler came to the
6  house. As mother acknowledged in her testimony, the house was very small, and if she was
7  at home she would have heard someone knocking at the door. The Court also finds mother's
8  testimony that she did not tell law enforcement about her son's version of events because
9  "she did not want to get involved" less than credible. The Court thus rejects Defendant's
10 mother's version of events.

11 40. As to the contradictory statements made by Defendant's cousin, Wayman, to
12 the various witnesses in this matter, the Court finds that neither version is entitled to credence
13 over the other, and thus the hearsay testimony of Wayman does not raise in the Court's mind
14 a reasonable doubt.

15 41. The Court further finds that Defendant Tymond J. Preston was born on
16 February 22, 1991 and is an enrolled member of the Navajo Tribe listed on the Navajo
17 Indian Census Roll and is 4/4 Navajo. (Exhibit 3).

18 42. The Court further finds that the victim in this case was an Indian born on July
19 8, 2001. On September 23, 2009, the victim was eight years old and thus had not yet reached
20 the age of twelve years.

21 43. The Court further finds that the incident for which Defendant was charged
22 occurred at Defendant's home within or on the outskirts of Tuba City, which is on the Navajo
23 Indian Reservation within the District of Arizona.

24 44. Having found that the government has proven each of the elements of the
25 charge beyond a reasonable doubt, the Court finds that Defendant is **guilty** of the charge of
26 Abusive Sexual Contact in violation of Title 18 U.S.C. §§ 1153 and 2244.

27 **IT IS HEREBY ORDERED** setting this matter for disposition on **August 29, 2011**
28 **at 3:30 p.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W.

1   Washington St., Phoenix, Arizona 85003-2151.

2   DATED this 2nd day of June, 2011.

*A. Murray Snow*

G. Murray Snow
United States District Judge